## Case No. 3,594.

### The DAVID E. WOLF.

[7 Int. Rev. Rec. 194.]

District Court, D. Massachusetts. 1867.

FORFEITURES — INTERCOURSE WITH INSURRECTIONARY STATES — CONTRABAND GOODS—CLEARANCE PAPERS—ESTOPPEL.

1. A vessel was chartered in November, 1862, for the purpose of carrying goods to Newbern, North Carolina. It being uncertain whether a permit could be obtained to go to Newbern, a license and a clearance were taken for Beaufort, with the alternative intent, on failure of obtaining a permit at Hatteras Inlet to proceed to Newbern, of landing the goods at Beaufort, and transporting them by rail to Newbern, their destination. The vessel sailed November 14, 1862, and when about two miles down the harbor of Boston was seized, and there were found on board, besides the cargo of ice and other merchandise, three barrels of spirits marked "cider vinegar." *Held*, that under the statute of July 13, 1861 [12 Stat. 257], forbidding all intercourse with the states and parts of states which the president should declare to be in a state of insurrection, and the proclamation of the president dated August 16th, 1861 [12 Stat. 1262], and the regulations of the treasury department established August 28, 1862, the claimants were not estopped by their license and

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

clearance from showing that the primary destination of the voyage was to Newbern, and that by the setting sail on the voyage which might end at Beaufort with contraband articles on board, the condition of the license was not broken, and the vessel and cargo not forfeited to the United States, although the claimant of the cargo knew the spirits were on board, and had been declared contraband by the secretary of the treasury.

W. A. Field, for libellants.
J. C. Dodge, for claimants.

LOWELL, District Judge. This libel of information, filed November 19, 1862, alleges a forfeiture of the schooner and her cargo for undertaking to carry goods from the state of Massachusetts to the state of North Carolina contrary to section 5, St. July 13, 1861 (12 Stat. 257). The schooner belonged to her master, John E. Dole, who chartered her to Addison, Gage & Co., of Boston, for a voyage to Newbern. The charterers were acting only as agents of one Aaron Gage, who was engaged in business at Newbern, but was present in Boston during most of the time that the schooner was loading, and fitted her with ice and other merchandise, most of which he owned. The quartermaster of the United States also shipped a considerable quantity of potatoes for our troops at Newbern. It being uncertain whether a permit could be obtained to go to Newbern, a license was taken for Beaufort, with the alternative intent, on failure of such permit, to land the goods at that port, and transport them by rail to their destination. The schooner sailed November 14, 1862, and had gone about two miles down the harbor of Boston when she was seized, and it was found that there were three barrels of ardent spirits on board, which were marked "cider vinegar," and so entered on the manifest. The evidence rendered it probable that neither the master nor the charterers were aware of the contents of the three barrels, but that Aaron Gage was aware of it, and was interested in the spirits, either as owner or as consignee. The vessel and cargo, except the spirits, were claimed and released on stipulation, and proceeded to Hatteras Inlet, where, after some delay, a permit was obtained, and the voyage ended at Newbern, as originally contemplated.

The statute of the 13th of July, 1861, forbids all intercourse between the states and parts of states which the president shall declare to be in a state of insurrection, and all other parts of the Union, and forfeits all goods proceeding from one to the other, together with the vessel conveying them; provided that the president may license such intercourse in such articles, etc., as he may consider to be for the public interest to be carried on under regulations to be prescribed by the secretary of the treasury. The president, by his proclamation of August 16, 1861 (12 Stat. 1262), declared several states, including North Carolina, excepting such parts as may from time to time be occupied and controlled by forces of the United States engaged in the dispersion of the insurgents, to be in a state of insurrection.

At the time of this voyage and seizure both Beaufort and Newbern were occupied and controlled by our forces, and had been so for some eight months, together with a considerable part of the surrounding country. The inhabitants of those towns were not enemies, and trading with them was not trading with the enemy. The Venice, 2 Wall. [(69 U. S.) 258]. They were within the exception of the proclamation, and therefore excepted from the prohibition of the statute, which conclusively adopts, in advance, as insurrectionary territory, whatever the proclamation may declare to be such. The libel should have negatived the exceptions of the proclamation, as applied to the particular part of North Carolina to which this vessel was proceeding. I have had occasion lately to examine this point of negative allegation in an indictment, and the rule is not different in such a case as this. It is that, when an exception is so far made a part of the description of the offence that the offence cannot be laid in the language of the statute without referring to the exception, the latter must be referred to and negatived. Such is this case. The proclamation does not say that North Carolina is and shall be considered in a state of insurrection, but that North Carolina, excepting such parts, etc., is and shall be so considered. There is, therefore, a fatal variance between the libel and the proofs, and the objection is one of substance, because, if there be a forfeiture here, it is by reason of a breach of treasury regulations, and not of the statute of July 13. But as the claimants, by their answer, assumed to meet the case of a trading to Beaufort, and no surprise or injury has resulted to them, an amendment might perhaps have been allowed, if moved for at the trial, and may be hereafter, possibly, on appeal; and I will therefore consider the case as it was tried and argued.

The primary destination was to Newbern, as everybody perfectly well knew, and there was no fraud intended or practised in taking the license to Beaufort; and, although the answer sets up a voyage to Beaufort, this was not intended as any concealment. Nor was any distinction known to the claimants, then or afterwards, between the two ports, until I suggested it in court. Under these circumstances, I do not hold the claimants estopped by their license or by their answer from showing the truth of the case in reply to an information which merely alleges a voyage to North Carolina, though, if the libellants amend hereafter, it may be well for the claimants to do so too.

At this time trade to Newbern was governed by regulations established August 28, 1862, by the secretary of the treasury, with the concurrence of the secretaries of war and of the navy, which were printed, and may be presumed to have been known to the traders,

and which provide, among other things, that no permit shall be granted to ship goods to states or parts of states heretofore declared to be in insurrection, or occupied by the military forces of the United States, excepting to persons residing or doing business there, of known loyalty (article 6); that application for a permit may be made to such authorized officer of the customs near the point of destination as may suit the convenience of the shipper (article 11); and that intoxicating drinks shall not be permitted to be shipped to territory occupied by our forces, except upon the written request of the commander of the department (article 8). They also require a full and true description to be given of the merchandise for which a permit is asked (articles 4 and 5), and declare the penalty of forfeiture for any violation of the regulations, or false statement made or deceptive practice in obtaining a permit (article 5).

The fair result of these regulations is that the projectors of this voyage, considered as a voyage to Newbern only, were not bound to procure any permit at Boston, but might properly wait, as they in fact did, at Hatteras Inlet, for permission to go to Newbern. They had prosecuted such a voyage before with the knowledge and by the advice of the officers of the government, and, for aught I see, with entire regularity. Whether they had ardent spirits on board or not is immaterial, because it was at Hatteras Inlet that they were to ask for a permit and make an exhibit of the goods for which they desired it; and a fraud or concealment on that application would be visited with the appropriate penalty. They had no dealings here, and were not bound to have any, relating to their voyage to Newbern; but took here a clearance for Beaufort as an alternative, and in obtaining this clearance the false statement was made. The port of Beaufort was subject to quite another set of rules. That port, together with New Orleans and Port Royal, had been opened by the president's proclamation of May 12, 1862 (12 Stat. 1263), excepting as to contraband of war, and subject to the regulations of the secretary of the treasury annexed to the proclamation, which prescribe that a license must be obtained from his department in each case. In his orders to collectors, dated May 16 and May 23, 1862, he gives them power to grant these licenses in the form which was followed in this case, and orders them to consider ardent spirits contraband of war. All the persons connected with this vessel knew that spirits were not permitted to be shipped, and that they were commonly called contraband by the officers and others. The license was expressed to be on condition that the vessel should carry no persons, property or information, contraband of war, either to or from the said port, and it contained a statement that a violation of any of its conditions would involve the condemnation and forfeiture of the vessel

and cargo. The government contend that by setting sail on this voyage, which might end at Beaufort, with contraband articles on board, the condition was broken and the forfeiture incurred. I am of opinion, however, that in constructing so stringent a penal clause it is more just and more consonant to sound principle to take the liberal view contended for by the claimants, that the breach would not be complete until such goods had actually been conveyed to the port; this is the ordinary meaning of the language itself, according to which a mere setting sail for a port is not a conveying goods to it. And it is confirmed by the published order annexed to and making a part of the proclamation which requires the collector at the port of destination to see to it that no violation of the license has been committed. I cannot say that a person who merely intended to go to Beaufort has carried contraband goods to Beaufort, any more than, in any other revenue case, I could hold that a person who left Europe, intending to smuggle goods into this port, had smuggled them as soon as he began his voyage. Still less could I hold this when the destination to Beaufort was only contingent. Decree for claimants.